**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**KIRK ACREY,**

      **Petitioner,**

      **v.**                    **CASE NO.  16-3211-JWL**

**NICOLE ENGLISH, Warden,**
**USP-Leavenworth,**

      **Respondent.**

**MEMORANDUM AND ORDER**

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner, a prisoner in federal custody at USP-Florence, proceeds *pro se*.  Petitioner challenges prison disciplinary proceedings while in custody at USP-Leavenworth ("USPL").  The Court issued an Order to Show Cause, Respondent filed an Answer and Return (Doc. 9), Petitioner filed a Traverse (Docs. 10, 13), and the matter is ready for resolution.  The Court finds that Petitioner does not allege facts establishing a federal constitutional violation and denies relief.

**I.  Background**

Petitioner was incarcerated with the Federal Bureau of Prisons ("BOP") at USPL at the time of filing his Petition.  On January 11, 2008, Petitioner was sentenced in the U. S. District Court for the Northern District of Illinois, and is serving a sentence for Distribution of Crack Cocaine  in violation of 21 U.S.C. § 841(a)(1).  Petitioner has a projected release date of June 30, 2018, via good conduct time release.  Disciplinary proceedings at USPL for use of the mail for an illegal purpose, attempted stealing and unauthorized reproduction of any document, resulted in Petitioner's loss of forty-one days of good time credit and loss of a one-year credit for participating in the Residential Drug Abuse Program ("RDAP").  Petitioner alleges the following

grounds in his petition: (1) the Incident Report was delivered to him 26 hours after the incident instead of within the 24-hour time frame outlined in BOP policy; (2) his case manager talked to the Disciplinary Hearing Officer ("DHO") about the incident even though he was not IDC-certified; and (3) the administration altered the delivery date for the Incident Report in an attempt cover up their wrongdoing. Petitioner asks the Court to restore his forty-one days of good conduct time and to remove the discipline from his record so he can receive his one-year reduction in his sentence under 18 U.S.C. § 3621(e) for participation in the RDAP.

## II. Facts

On October 5, 2015, inventoried property of another inmate who was scheduled to be released that day (the "releasing inmate"), included two sealed envelopes with Petitioner's register number and return address. (Doc. 16–1, at 43.) The envelopes were discovered the previous night, when the releasing inmate was locked up in the Special Housing Unit ("SHU"). Although Petitioner requested to have the letters returned to him several times throughout that evening, the officer working the housing unit sent the letters to the Special Investigative Section ("SIS"). *Id.* While the incoming SIS Technician approached the SIS Office, he was stopped by Petitioner, who stated that he wanted his letters back. *Id.*

The envelopes contained letters to the IRS and Child Support Services, a self-made money order, a 1040 Individual Income Tax Return showing Petitioner is owed $35,464.65 from a 1099 OID form, a 1040-V payment voucher for the same amount to be used to pay child support, and a letter to Felonda instructing her on how to fill out the 1099 OID and 1096 forms, along with sample copies of the forms. *See id.* at 49–59, 74.

The SIS Technician who opened the envelopes wrote Petitioner's Incident Report No. 2769171 ("IR") on October 6, 2016, for violating Code 196, use of the mail for an illegal

purpose; Code 219 (A), stealing (attempted); and Code 314, unauthorized reproduction of any document. *Id*. The reporting staff member signed the IR at 7:00 a.m. on October 6, 2016. The IR, which contained a delivery date and time of October 7, 2015, at 9:35 a.m., was delivered to Petitioner and Petitioner was advised of his rights. *See* Doc. 13, at 16. Later, the delivery date on the IR was changed to October 6, 2015. *See id.* at 17.

The IR was suspended pending a referral to the Federal Bureau of Investigation for potential prosecution. (Doc. 16–1, at 61–63.) Prosecution was declined, and the IR was released for administrative processing on October 13, 2015. *Id*. The IR was reissued to Petitioner, and investigated by staff on October 13, 2015. Petitioner was again advised of his rights during the investigation, and stated "I have no statement to make." *Id*. The IR was forwarded to the Unit Discipline Committee ("UDC") for further disposition. *Id*.

Petitioner had an opportunity to appear before the UDC on October 13, 2015, and stated "[t]hey violated the 24 hour [r]ule." *Id*. at 43. The UDC referred the matter to the DHO for further disposition, due to the severity of the charge. *Id*.

Petitioner was given a Notice of Disciplinary Hearing before the DHO and a copy of the Inmate Rights at Discipline Hearing on October 13, 2015. *Id*. at 65, 67–68. Included among those rights was the opportunity to have a staff representative assist with the Discipline Hearing, the right to call witnesses and to present documentary evidence on Petitioner's behalf, and the right to present a statement to the DHO or remain silent. *Id*. Petitioner signed the Notice of Discipline Hearing, and, while he refused to sign the Inmate Rights at Discipline Hearing Form, staff signed indicating he received the form. *Id*. Petitioner noted that he did not wish to call any witnesses, but that he wished to have a staff representative to assist him during the disciplinary process. Petitioner requested the assistance of "Officer Edwards." *Id*.

A hearing on IR No. 2769171 was held before the DHO on October 28, 2015—over twenty days after Petitioner first received the IR from staff, and fifteen days after the IR was reissued to him. *Id*. at 70–76. The DHO reviewed Petitioner's due process rights with him at the hearing. *Id*. at 72. Petitioner requested a staff representative, did not request any witnesses, and provided documentary evidence. The DHO ensured that Petitioner understood his due process rights and was prepared to proceed with his disciplinary hearing.

Officer Edwards appeared as Petitioner's staff representative, and stated that Petitioner:

> wanted me to address the dates and policy. His copy of the report says it was written and delivered on the 7th. He wanted me to get information from Burge that he tried to get the letter from him. Burge sent an email stating he asked him for the letter several times. He wanted me to talk to Associate Warden Loftness about the dates of the report. Mr. Loftness stated the dates were solid.

*Id*. at 70, 75. The DHO considered the staff representative's statement in making her determination. *Id*. at 75.

Because Petitioner was questioning staff regarding the dates on his IR, including questioning Associate Warden Loftness via a request through his staff representative, the DHO received inquiries from staff prior to the DHO hearing regarding the appropriateness of the dates of delivery recorded on Petitioner's IR. *Id*. at 11. The DHO did not consider these inquiries in making her decision and merely informed staff that, generally, correcting the delivery date of an incident report would not impact an inmate's due process rights as long as the inmate at issue was provided sufficient time before the DHO hearing to prepare his defense. *Id*. The DHO also explained that she would review and address the date issue based on the evidence presented at the DHO hearing. *Id*.

In response to Petitioner's requests, including a request through his staff representative, staff member Burge sent the DHO an email received on October 16, 2015, which the DHO also considered. Staff member Burge reported that:

> [o]n 3 separate occasions this evening, [Petitioner] has asked me to let you know that "he tried on two different occasions to get his mail back" from the inmate[']s possession that was supposed to be leaving the following morning. He kept insisting that he had a change of heart and that he was trying to prevent it from being sent out. The feeling I got is that he was nervous and was trying to prevent anyone from searching it. When I found the mail and noticed that it was outgoing and sealed I told him I would need to inspect it before returning it. The night ran short and I remembered his mail on the shelf at the same time I was being relieved. I gave the mail to C/O Mann and asked him to please check it out for me.

*Id*. at 74, 78.

Petitioner appeared before the DHO at the hearing and presented a verbal statement. Petitioner denied the charge and verbally stated:

> [t]he child support officer sent me a letter asking me for my 1099 form. I have been locked up for some time. I was sending the information to the IRS. Other inmates have gotten their child support back payments cleared by doing this before. I stopped the mail from going out once they packed out [the releasing inmate]. I told the officer it was in his property. My original intent was to have him take it out with him on the 5th but I changed my mind after count.

*Id*. at 70.

Petitioner also provided documentary evidence, including a portion of Program Statement 5270.09, noting the time frames incident reports should be delivered to the inmate—within 24 hours from the time staff become aware of the violation or, when referred for prosecution, by the end of the next business day once released for administrative processing. *Id*. at 71. Petitioner also provided a section of a statute imposing a fine for personnel who falsify,

conceal or cover up a material fact, make a materially false, fictitious, or fraudulent statement or representation, or knowingly make or use any false writing or document. *Id.* In addition, Petitioner provided a letter from Child Support Services stating Petitioner will need to provide a print out of his trust fund account records and noting:

> I am not sure what you mean about how much of your credit has been used up. You should have access to your balances that you have in your account at the prison. This is the record that is being asked that you send for your modification review. This department does not have access to 1099 OID's and would not be able to send a copy of your 1099 OID unless you were to send it to the department yourself.

*Id.* at 71, 80. Finally, Petitioner provided a copy of the IR showing a written delivery date of October 7, 2015. *Id.* at 71, 83. The DHO considered all of Petitioner's documentary evidence. *Id.* at 72, 74.

The DHO also considered the IR and investigation, and the October 5, 2016 staff email to SIS stating:

> I sent two letters from [Petitioner] . . . to SIS with a note on it explaining the situation. The two letters were found already sealed in [the releasing inmate's cell] when the two inmates in that cell got locked up in the SHU last night. One of the inmates that was locked up, [the releasing inmate], is scheduled to be released this morning. So it appears that [Petitioner] was trying to get [the releasing inmate] to take the letters out with him and mail them from outside the institution. Also, I couldn't tell whether the contents of the letters were legit IRS info or some sort of scam. But [Petitioner] was asking to get the letters back as soon as I got to work last night, and looked pretty concerned when I told him that they were sent to you this morning after I opened the unit . . . .

*Id.* at 45, 73. The DHO considered the written account of the SIS Technician who opened the envelopes and reviewed their contents, as well as copies of the envelopes, which had a return address label with Petitioner's name, address and register number, and were addressed to Felonda at an Illinois address. *Id.* at 72. The DHO considered the contents of the letters,

including the letters to the IRS and Child Support Services; the notice of past due child support in the amount of $35,464.65, with a stamp, typed at an angle, indicting it is a money order; the IRS 1040-V payment voucher for $35,464.65; the 1040 IRS Income Tax Return for $35,464.65, which refers to a 1099 OID; and the letter to Felonda instructing her on how to complete the 1099 OID and 1096 forms, as well as the sample copies of those forms. *Id*. at 74.

The DHO also considered a hand-written letter from the releasing inmate stating that Petitioner "asked me to drop 2 letters in the mail for him. He only said that they were in regards of something to do with child support. I didn't ask anymore questions and that was it." *Id*. at 47, 74. The DHO considered IRS Bulletin Notice 2010-33 and a Fact Sheet, indicating positions considered frivolous by the IRS, including use of a form 1099 OID to obtain a monetary payment or refund. *Id*. at 73, 85–89.

The DHO found that, based on the evidence, Petitioner committed the prohibited act of abuse of the mail for an illegal purpose (attempted) in violation of Code 196(A). The DHO determined that Petitioner attempted to have another inmate remove from the institution the two letters written and sealed by Petitioner. *Id*. at 13–14, 74. The DHO explained to Petitioner that because the government does not owe him $35,464.65 in order to pay his child support, these actions constitute fraud. The DHO removed Code 219(A) stealing (attempted) and Code 314, unauthorized reproduction of any document, because she determined that a separate charge for these codes would constitute a stacking of the charges, since the same actions for each charge are included in the charge against Petitioner for violating Code 196(A). *Id*. at 15.

In making her determination, the DHO placed greater weight on the IR written by the SIS officer as it was backed by copies of the documents, and she drew a negative inference against Petitioner based on his silence before the investigating Lieutenant. *Id*. at 75. While she

considered Petitioner's defense that the child support office sent him a letter requesting the 1099 form, that other inmates have cleared their back payments this way, and that he stopped the letter from going out, the DHO was not convinced of Petitioner's innocence. *Id.* Based on the letter from Child Support Services, the DHO determined that Child Support Services only informed Petitioner to submit a form 1099 after Petitioner submitted an inquiry to them seeking the form. Further, the IRS has issued bulletins and fraud alerts about the Form 1099-OID, Refund Scheme. The DHO was also not convinced that other inmates had cleared their back child support payments by this method as it is considered fraud. *Id*.

The DHO found that although Petitioner claimed that he stopped the letters from going out, the letters were sealed, addressed with postage, and were only intercepted by staff after the releasing inmate was involved in an incident the night before he was scheduled to release to a residential reentry center, resulting in his property being packed by staff. *Id.* Further, both Petitioner and the releasing inmate stated it was Petitioner's intent for the releasing inmate to take the letters out with him upon his release. *Id.*

The DHO considered the change in the date the IR was delivered to Petitioner, and determined that the date was changed to correct an error and the IR was actually written and delivered on October 6, 2015. *Id*. at 72. The DHO also acknowledged that BOP policy indicates that if an incident report is referred for prosecution, the report is delivered by the end of the next business day after release for administrative processing. The DHO determined that by receiving the IR prior to the report being released for administrative processing, Petitioner was provided additional time to prepare his defense and the delivery date did not hinder his ability to prepare his defense. *Id.* The DHO also acknowledged a typographical error in the IR stating the amount

of the requested refund from the IRS was $34,464.565, instead of $35,464.65, but determined that this typographical error also did not hinder Petitioner's ability to prepare a defense. *Id.*

The DHO sanctioned Petitioner with the disallowance of forty-one days of Good Conduct Time, one hundred twenty days loss of commissary and email privileges, and a $100 monetary fine. *Id.* at 75. The disciplinary sanctions imposed were consistent with those allowed by policy, and were imposed in an effort to deter this type of misconduct in the future. *Id.* at 16. Petitioner was advised of the DHO's findings and his ability to appeal through the administrative remedy process within twenty days of the receipt of the report. *Id.* at 76. The DHO subsequently generated a written report which she signed on November 6, 2015, and it was delivered to Petitioner on November 10, 2015. *Id.* The DHO is a certified DHO, an impartial hearing officer that was not personally involved with the incident, the UDC hearing, or any other part of the initial disciplinary process. *Id.* at 17.

Pursuant to the regulations in effect during October 2015, an inmate who is found to have committed a prohibited act involving drugs, alcohol, violence, escape, attempted escape or any 100-level series incident "will be removed from RDAP immediately." (Doc. 9–3, at 4); *See* 81 Fed. Reg. 24484–02, at p. 24485 (April 26, 2016) (removing section (g) from 28 C.F.R. § 550.53). Petitioner was expelled from RDAP on October 29, 2015, for violating Disciplinary Code 196(A)—a 100 level series incident. (Doc. 9–3, at 4, 18–19.) In 2016, Petitioner was again deemed eligible for RDAP, and he began participating in the unit-based component of the program on February 16, 2016. *Id.* at 4, 16. However, on August 11, 2016, Petitioner was placed in the SHU and his RDAP status was changed to Drug Abuse Program Incomplete. *Id.* at 4–5, 16, 25–26. According to his RDAP Status Form, once he is able to resume programming his § 3621(e) date is likely to change based on his projected completion date. *Id.* at 5.

### III. Discussion

#### 1. Exhaustion

Generally, a federal prisoner must exhaust available administrative remedies before commencing a habeas corpus petition under 28 U.S.C. § 2241. *Williams v. O'Brien*, 792 F.2d 986, 987 (10th Cir. 1986) (per curiam). The BOP's four-part administrative remedy program is codified at 28 C.F.R. § 542. Under the administrative remedy program for inmates, an inmate is required to first attempt informal resolution of the complaint, and if unsuccessful, he must raise his complaint, with the informal resolution attached, to the Warden of the institution where he is confined. If dissatisfied with that response, he may appeal his complaint to the Regional Director. If the inmate is dissatisfied with the Regional Director's response, the inmate may appeal to the National Inmate Appeals Administrator in the Office of the General Counsel in Washington, D.C. ("Central Office"). Generally, an inmate has not exhausted his remedies until he has sought review and received a final substantive response at all three levels. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (finding that exhaustion requires "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)") (citation omitted)). For certain disciplinary actions, involving a decision by the DHO, an inmate may appeal the decision directly to the Regional Director, and by-pass the institution-level procedures. *See* 28 C.F.R. § 542.14(d)(2). If an inmate does not receive a response within the allotted time for reply, including extensions, the inmate may consider the absence of a response to be a denial at that level. *See* 28 C.F.R. § 542.18.

Respondent acknowledges that Petitioner has exhausted his administrative remedies with respect to his October 2015 discipline. (Doc. 9 at 7.) However, Petitioner did not exhaust his administrative remedies regarding his claims related to his October 2015 expulsion from the

RDAP and loss of associated early release eligibility under 18 U.S.C. § 3621(e). His Administrative Remedy Nos. 843591-R1 and 843591-A1, challenged his October 2015 discipline and asserted procedural errors associated with this discipline. Petitioner did not raise any issues regarding his expulsion from the RDAP or associated early release eligibility under 18 U.S.C. § 3621(e). (Doc. 9–2, at 6–7, 26–36.) To properly exhaust administrative remedies, the petitioner must have presented the same claims in the administrative grievance that appear in the court petition. *Williams v. Wilkinson*, 659 F. App'x 512, 514 (10th Cir. 2016) (citing *Woodford*, 548 U.S. at 94).

Even if Petitioner had exhausted his administrative remedies, his claim regarding his expulsion from the RDAP would fail. Petitioner's claim regarding his expulsion and loss of entitlement to early release under the RDAP are dependent on his success in arguing for expungement of the IR at issue in this case. Because the Court finds that the DHO's decision was supported by "some evidence" and the Petitioner received due process in his disciplinary proceedings, his argument for expungement fails.

### 2. Standard of Review

To obtain habeas corpus relief, an inmate must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S. C. § 2241(c)(3). A federal prisoner has a constitutionally protected liberty interest in his earned good-conduct time. *See Brown v. Smith*, 828 F.2d 1493, 1494 (10th Cir. 1987). Therefore, Petitioner was entitled to due process at his disciplinary hearing. *Howard v. Bureau of Prisons*, 487 F.3d 808, 811 (10th Cir. 2007). However, because prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so," the "full panoply of rights due a defendant in

[criminal] proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556, 561 (1974); *see also Abdulhaseeb v. Ward*, 173 F. App'x 658, 661 (10th Cir. 2006).

In *Wolff*, the Supreme Court held that in order to satisfy due process in a prison disciplinary proceeding, the inmate must receive: (1) "advance written notice of the claimed violation" no less than 24 hours prior to the hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals;" and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action." *Wolff*, 418 U.S. at 563–66 (citations omitted); *see also Abdulhaseeb*, 173 F. App'x at 661 (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)); *Smith v. Maschner*, 899 F.2d 940, 946 (10th Cir. 1990). Additionally, there must be some evidence to support the decision and the decisionmaker must be impartial. *Gwinn v. Awmiller*, 354 F.3d 1211, 1219 (10th Cir. 2004) (citing *Wolff*, 418 U.S. at 592) (Marshall, J., concurring)).

### 3. Procedures

The Court has no difficulty finding that Petitioner was afforded all the due process protections mandated by *Wolff*. The administrative record and the undisputed facts plainly demonstrate that Petitioner was afforded all three procedural protections mandated by *Wolff*. He was given advance written notice of the charge by delivery of the IR more than 24 hours prior to the DHO hearing. The IR, if delivered on October 7, was twenty-one days before his October 28, 2015 DHO hearing. The IR was delivered again on October 13, fifteen days before the DHO hearing. Petitioner was advised of his procedural rights before the DHO hearing and given the opportunity to present witnesses and documentary evidence in his defense. He declined to present witnesses but did present documentary evidence. Finally, he was provided a

copy of the DHO's written statement, which sets forth the evidence relied upon and the reasons for the disciplinary action and sanctions.

Petitioner claims that the IR was not delivered to him within 24 hours of the time staff became aware of his alleged misconduct, as required by BOP policy. Petitioner alleges that staff became aware of his alleged misconduct at 7:36 a.m. on October 6, 2015, and delivered the IR at around 9:38 a.m. on October 7, 2015. Petitioner further alleges that staff covered up the 7 with a 6 in an attempt to cover up their failure to timely deliver the IR. Petitioner also argues that staff violated BOP policy because he was questioned before the FBI or other investigative agency released the IR for administrative processing. Petitioner argues that the penalty for the staff's violation of the 24-hour policy and alleged cover-up should result in the dismissal of his IR. (Doc. 13, at 4.)

Petitioner alleges that the staff's failure to follow their own policy statement denied him due process, citing Policy Statement 5270.09. However, "prison regulations are meant to guide correctional officials, not to confer rights on inmates." *Farrakhan-Muhammad v. Oliver*, ___ F. App'x ___, 2017 WL 460982, at *1 (10th Cir. Feb. 3, 2017) (unpublished) (citing *Sandin v. Conner*, 515 U.S. 472, 481–82 (1995)); *Cooper v. Jones*, 372 F. App'x 870, 872 (10th Cir. 2010) (unpublished) ("The process due here is measured by the Due Process Clause of the United States Constitution, not the internal policies of the prison.").

BOP regulations provide that the inmate "will *ordinarily* receive the incident report within 24 hours of staff becoming aware of [the inmate's] involvement in the incident," and that "the staff investigation of the incident report *may* be suspended before requesting [the inmate's] statement if it is being investigated for possible criminal prosecution." *See* 28 C.F.R. § 541.5(a) and (b)(2) (emphasis added). The Program Statement relied on by Petitioner provides that "[t]he

incident report should be delivered to the inmate within 24 hours of the time staff become aware of the inmate's alleged misconduct. If an incident is referred for prosecution, the report is delivered by the end of the next business day after release for administrative processing." Program Statement 5270.09, *Inmate Discipline Program*, p. 19 (August 1, 2011). The Program Statement also provides that:

> When it appears likely that the incident may involve criminal prosecution, the investigating officer suspends the investigation. Staff may not question the inmate until the FBI or other investigative agency releases the incident report for administrative processing. The incident report should then be delivered to the inmate by the end of the next business day. The time frame for processing the Incident report is suspended until it is released for processing.

*Id.* at p. 18.

The minor deviations from BOP regulations or policy statements did not violate the Constitution. Addressing a similar issue, this Court in *Kesling v. Maye*, stated that:

> The pertinent regulation states that an inmate "will *ordinarily* receive the incident report within 24 hours of staff becoming aware of [the inmate's] involvement." 28 C.F.R. § 541.5(a) (emphasis added). The regulation, then, does not mandate a strict 24-hour timeframe in which BOP officials are required to provide an inmate with a copy of an incident report. In this case, the record indicates that Mr. Kesling received the incident report at 7:46pm on June 22, 2014 and that the BOP became aware of Mr. Kesling's involvement sometime between 4pm and 6pm on June 21, 2014. To the extent a minor violation occurred, it does not rise to the level of a constitutional violation under *Wolff*.

*Kesling v. Maye*, Case No. 16-3034-JWL, 2016 WL 2736080, at *2 (D. Kan. May 10, 2016) (citing *Brown*, 196 F. App'x at 683)); *see also Brennan v. United States*, 646 F. App'x 662, 667 (10th Cir. 2016) (unpublished) (rejecting the petitioner's argument that the BOP's failure to provide an inmate with an incident report within 24 hours of the incident violated due process), *cert. denied sub nom. Brannan v. United States*, 137 S. Ct. 695 (2017); *Brown v. Rios*, 196 F.

App'x 681, 683 (10th Cir. 2006) (unpublished) (finding that allegations of failure to serve incident report within 24 hours, failure to provide UCD hearing within three working days, and denial of access to legal materials and prison library, failed to raise a due process violation under *Wolff*); *see also Wallace v. Fed. Det. Ctr.*, 528 F. App'x 160, 162–63 (3d Cir. 2013) ("[E]ven if [BOP] regulations were violated, Wallace cannot show that his right to due process was infringed, where *Wolff* does not require issuance of the charge within 24 hours of the incident or a hearing within three days of the alleged conduct, and where any delay did not prejudice him.").

Petitioner also alleges that his case manager, Mr. Toot, talked to the DHO and told Petitioner that he was "not about to get off because staff made a minor mistake." Petitioner claims that his case manager was not Inmate Discipline Committee ("IDC")-certified as is required for an employee reporting the incident or otherwise being involved in the incident. The Program Statement provides that:

> The Investigating Officer is an employee at the supervisory level who conducts an investigation of alleged inmate misconduct. The Investigating Officer must be IDC-certified, and may not be the employee reporting the incident or otherwise be involved in the incident. The officer is ordinarily a Lieutenant, but the Warden may appoint another staff member.

Program Statement 5270.09, *Inmate Discipline Program*, p. 18 (August 1, 2011). Petitioner's IR does not reflect that Case Manager Toot was involved with the UDC proceedings, and it lists J. Herbig, SIS Technician, as the reporting employee. (Doc. 16–1, at 43.) There is no evidence that Petitioner's case manager was the "Investigating Officer," and the DHO refers to the investigator as a "Lieutenant." *Id*. at 75. Petitioner's argument regarding violation of the Program Statement is insufficient to show a due process violation. *See Miller v. Terris*, 2013 WL 6801157, at *3 (E.D. Mich. Dec. 23, 2013) (finding that there was no allegation that the Lieutenant conducting the investigation was not IDC certified and that noncompliance with a

BOP Program Statement is not a violation of federal law, in that such Program Statements are not mandated by statute or the federal constitution).

Although Petitioner takes issue with his case manager talking to the DHO about the 24-hour deadline for delivering the Incident Report, he does not allege that the DHO was not impartial. "An impartial decisionmaker is a fundamental requirement of due process that is fully applicable in the prison context." *Gwinn v. Awmiller*, 354 F.3d 1211, 1220 (10th Cir. 2004) (internal quotation marks omitted). But, "because honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Farrakhan-Muhammad*, 2017 WL 460982, at *1 (quoting *Tonkovich v. Kan. Bd. Of Regents*, 159 F.3d 504, 518 (10th Cir. 1998) (internal quotation marks omitted)).

The DHO stated that she did not consider the inquiries in making her decision and merely informed staff that, generally, correcting the delivery date of an incident report would not impact an inmate's due process rights as long as the inmate at issue was provided sufficient time before the DHO hearing to prepare his defense. The DHO also explained that she would review and address issues related to the dates based on the evidence presented at the DHO hearing. The DHO considered the change in the date the IR was delivered to Petitioner, and determined that the date was changed to correct an error. In order to insure impartiality, a DHO may not be a victim, witness, investigator, or otherwise significantly involved in the incident. 28 C.F.R. § 541.8(b). In this case, the DHO was a certified DHO who was not personally involved with the incident, the UDC hearing, or any other part of the initial disciplinary process. Petitioner's allegation that his case manager was not IDC-certified is insufficient to demonstrate a denial of due process.

### 4. Some Evidence

Petitioner asserts that he is not arguing as to whether or not there was evidence of guilt for attempting to circumvent the mail.  (Doc. 13, at 3.)  The Court finds that there was "some evidence" to support the DHO's decision.  Where the due process requirements of *Wolff* are met, as is the case here, the decision of the DHO will be upheld if there is "some evidence" to support the decision.  *Hill*, 472 U.S. at 455. "The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact."  *Terry v. Jones*, 259 F. App'x 85, 86 (10th Cir. 2007), *cert. denied*, 554 U.S. 924 (2008) (quoting *Hill*, 472 U.S. at 456).  A decision to revoke good time credits would only violate due process if the record is "devoid of evidence, providing no support for a disciplinary board's decision."  *Id.* (citing *Hill*, 472 U.S. at 457).  "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Hill*, 472 U.S. at 457.

The Court is bound by the "some evidence" standard and finds that the evidence relied upon by the DHO satisfies that standard.  "Ascertaining whether [the some evidence] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 455–56; *see Mitchell*, 80 F.3d at 1445.  "The decision can be upheld even if the evidence supporting the decision is 'meager.'"  *Mitchel*, 80 F.3d at 1445 (citing *Hill*, 472 U.S. at 457).

**IV. Conclusion**

Petitioner's allegations fail to raise a due process violation under *Wolff*. The Court finds that Petitioner received adequate due process in his prison disciplinary proceedings, and the decision of the DHO is supported by some evidence.

**IT IS THEREFORE ORDERED BY THE COURT** that this petition for writ of habeas corpus is **denied**.

**IT IS SO ORDERED**.

**Dated in Kansas City, Kansas, on this 24th day of April, 2017.**

<div style="margin-left: 40%">

**s/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**

</div>